# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39315**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Roland G. THOMAS**
Master Sergeant (E-7), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 28 February 2019

———————————

*Military Judge:* James E. Key, III.

*Approved sentence:* Dishonorable discharge, confinement for 2 years, and reduction to E-3. Sentence adjudged 20 March 2017 by GCM convened at Joint Base San Antonio-Lackland, Texas.

*For Appellant:* Major Allen S. Abrams, USAF; Brian L. Mizer, Esquire; Robert D. Graham, Legal Extern.[1]

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Captain Peter F. Kellett, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, DENNIS, and LEWIS, *Appellate Military Judges*.

Senior Judge JOHNSON delivered the opinion of the court, in which Judge DENNIS joined. Judge LEWIS filed a separate opinion concurring in the result.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

———————————

---

[1] Mr. Graham was a law student extern and was at all times supervised by an attorney admitted to practice before this court.

JOHNSON, Senior Judge:

A general court-martial composed of officers convicted Appellant, contrary to his pleas, of one specification of negligent dereliction of duty and one specification of sexual assault in violation of Articles 92 and 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 920.[2] The court members sentenced Appellant to a dishonorable discharge, confinement for two years, and reduction to the grade of E-3. The convening authority approved the adjudged sentence but deferred the reduction in rank until action and waived automatic forfeitures for a period of six months for the benefit of Appellant's dependent child.

Appellant raises six issues on appeal: (1) whether the military judge erred by excluding evidence pursuant to Military Rule of Evidence (Mil. R. Evid.) 412; (2) whether the evidence is legally and factually sufficient to support Appellant's sexual assault conviction; (3) whether trial counsel committed prosecutorial misconduct during her argument on findings; (4) whether the court members' announcement of findings amounted to a finding of not guilty as to all specifications alleging sexual assault or whether the announcement was fatally ambiguous; (5) whether the military judge committed plain error with respect to "human lie detector" testimony; and (6) whether the Government has violated Appellant's due process right to timely appellate review. We find the members' announcement of findings did not result in a finding of not guilty as to all sexual assault specifications and was not fatally ambiguous, and we find no violation of Appellant's right to timely post-trial and appellate review. However, we find error with respect to the exclusion of evidence under Mil. R. Evid. 412, and therefore we do not address legal and factual sufficiency, "human lie detector" testimony, or trial counsel's findings argument.

## I. BACKGROUND

Appellant met Technical Sergeant (TSgt) MP[3] in 2006 when they were both stationed in Germany. They were acquaintances but did not develop a romantic or sexual relationship at that time. TSgt MP left Germany in February

---

[2] Negligent dereliction of duty was a lesser included offense of the charged greater offense of willful dereliction of duty in violation of Article 92, UCMJ. The court members found Appellant not guilty of the greater offense of willful dereliction of duty, of one specification of sexual assault, of one specification of abusive sexual contact, and of two specifications of assault consummated by a battery in violation of Articles 92, 120, and 128, UCMJ, 10 U.S.C. §§ 892, 920, 928.

[3] For simplicity, we refer to TSgt MP by her rank as of the time of her testimony at Appellant's trial in March 2017.

2008; Appellant and TSgt MP maintained sporadic contact for several years afterwards via the Internet.

In 2014, Appellant and TSgt MP exchanged phone numbers. By October 2014 their communications intensified significantly. Between early October 2014 and December 2014 they exchanged numerous sexually-charged text messages describing their sexual habits, preferences, and activities they imagined engaging in together. In addition, TSgt MP sent Appellant revealing photos of herself, and on at least one occasion Appellant and TSgt MP masturbated together over live video and audio. The sexual and non-sexual text exchanges gradually ended between January and March 2015, although their tone remained friendly.

In August 2015, Appellant texted TSgt MP to let her know that at the end of the month he would be visiting the Tampa, Florida area where TSgt MP lived. They made plans to meet at TSgt MP's residence where she lived with her young son. Appellant arrived at TSgt MP's home on the afternoon of 28 August 2015. Appellant brought a bottle of cognac that he and TSgt MP began drinking as they talked. Approximately 30 minutes after Appellant arrived, TSgt MP received a call from a female friend, Staff Sergeant (SSgt) CW, who asked if she could come to TSgt MP's home. TSgt MP told SSgt CW that she could.

After SSgt CW arrived with her young daughter, the three adults spent the evening drinking and socializing while the children played together. SSgt CW observed that Appellant and TSgt MP giggled and laughed together, but they did not engage in any physical contact while SSgt CW was present. At one point Appellant went to a nearby liquor store and returned with tequila and more cognac. While Appellant was gone SSgt CW asked TSgt MP if TSgt MP had a romantic relationship with Appellant, and TSgt MP said "no."

Over the course of the evening TSgt MP consumed approximately seven mixed drinks and shots of alcohol. SSgt CW drank considerably less, only one mixed drink and one shot of alcohol. Appellant drank more than TSgt MP and SSgt CW combined. At trial, when asked whether TSgt MP showed signs of intoxication, SSgt CW testified TSgt MP exhibited "[a] lot of giggling, mumbling, she kind of zoned in and out," meaning she would "stare" while sitting on the couch. In addition, at one point TSgt MP went to the bathroom for an extended period of time; at another point TSgt MP "zoned out" for approximately ten seconds while cleaning under a sofa. However, TSgt MP was able to speak without slurring, to stand, and to walk on her own throughout the time SSgt CW was present. SSgt CW later described TSgt MP as "tipsy" but not "that drunk," and SSgt CW later expressed surprise that TSgt MP could not remember events from that night.

Later in the evening, TSgt MP complained that her stomach hurt and lay on her side on the sofa. At that point SSgt CW perceived that "[e]veryone look[ed] tired" and "done," so SSgt CW prepared to leave. SSgt CW put TSgt MP's son to bed. Appellant told SSgt CW that he would sleep on TSgt MP's sofa. When SSgt CW told TSgt MP she was leaving, TSgt MP responded "All right." SSgt CW then departed with her daughter.

At trial TSgt MP testified that she had not intended to have sex with Appellant that night. She testified that while she was in the bathroom she found she had begun menstruating. TSgt MP felt "relieved" because she "was not going to have sex with [her] period just starting." She inserted a tampon and returned to her guests. When TSgt MP later returned to the bathroom to check her tampon she "doze[d] off" there for some period of time. When she awoke, she again returned to her guests.

TSgt MP testified she did not remember SSgt CW leaving. TSgt MP also did not remember sending a text message to a friend at approximately 0100 on 29 August 2015. TSgt MP's last memory of that night involved the following sequence of events: she was standing between her bedroom door and her living room, with Appellant standing in front of her. TSgt MP recalled she asked Appellant where SSgt CW was, and Appellant told her SSgt CW had departed. TSgt MP then asked what time SSgt CW left, and Appellant said he did not know. TSgt MP took a step into the living room to look at a clock that indicated the time was 0200. Finally, she remembered the bedroom door closing.

TSgt MP awoke the next morning lying on her bed, wearing her shirt and bra but naked from the waist down. She had no memory of sexual intercourse, but her vagina was "hurting." TSgt MP could not find or detect her tampon, but there was no blood on the bed. Appellant was lying next to her wearing only socks. When Appellant awoke and began to dress, TSgt MP asked him if there had been a tampon inside her, and she told him her period had started the night before. Appellant responded that there had been no tampon, nor had there been any blood on "the rubber." From these responses TSgt MP inferred they had had sex.

Shortly thereafter the two went into TSgt MP's living room so that Appellant could use TSgt MP's computer. TSgt MP later testified that in the living room Appellant made the comment, "You sure know how to ride the tool." TSgt MP then took a shower. When she finished, TSgt MP's son and Appellant were sitting on the couch. TSgt MP told her son to "go somewhere" and then gestured for Appellant to join her in her bedroom. TSgt MP and Appellant then engaged in consensual sexual intercourse. At trial, TSgt MP explained her thoughts at the time:

A. [TSgt MP] In the shower I was thinking, "No. This -- I've known him, you know, -- known him, you know, for the last nine -- since 2006. There was no way that we had sex without me knowing. I'm just trying to replay every thought possible of what did I do to indicate that I wanted sex?" So I felt the need to actually have sex with him.

. . . .

Q. [Trial Counsel] How did that go?

A. Awkward. It was painful. It was -- it wasn't organic.

. . . .

Q. Okay. And you say it was "awkward." What makes it awkward?

A. Because I didn't want it.

Q. Okay.

A. I didn't know I had it the night before and I didn't want it the next day but I felt like I had to do it.

Q. Okay. Was it painful?

A. Mentally, it was painful. It hurt me to do that again because my vagina was already hurting from the night before.

Q. Okay. Did the two of you -- did you finish having sex?

A. The next day?

Q. Yeah.

A. No. It was 30 seconds long at the most.

Q. Okay. Did he ejaculate?

A. No, he didn't.

Q. Okay. What happened after that?

A. After that it was -- he left. I walked him out of the bedroom, walked him to the door, we might have exchanged another hug and he was on his way.

Over the next two days Appellant and TSgt MP exchanged a series of friendly texts in which they discussed, *inter alia*, potentially meeting for dinner with other friends. On 30 August 2015 Appellant departed for Texas.

After "a couple of days," TSgt MP's missing tampon came out. On 1 September 2015, TSgt MP informed Appellant about the tampon by text. Appellant responded, "u lying?!! [sic]." TSgt MP answered, "I could die from that. Not lying." Appellant replied, "Damn!! That's crazy [ ]." TSgt MP followed this exchange with a series of more probing texts seeking more information about what happened on the night of 28–29 August 2015. Appellant responded that he did not remember that night either but he was "certain [they] wouldn't have did [sic] anything" had he known she had a tampon inserted.

On 2 September 2015 TSgt MP went to the urgent care clinic at MacDill Air Force Base because of her concerns regarding having the tampon lodged inside her for several days. Her meeting with a physician's assistant led to an exam by a sexual assault nurse examiner (SANE) and to TSgt MP's interview by the Air Force Office of Special Investigations (AFOSI).

## II. DISCUSSION

### A. Mil. R. Evid. 412

#### 1. Additional Background

##### a. Defense Motion and Military Judge's Ruling

Before trial, the Defense submitted a notice and motion to admit evidence of TSgt MP's sexual behavior and predisposition pursuant to Mil. R. Evid. 412.[4] Specifically, the Defense sought to introduce evidence of the text messages Appellant and TSgt MP exchanged dating back to October 2014, of "flirtatious" behavior between TSgt MP and Appellant on the night of the alleged sexual assault, and of the consensual sexual intercourse between Appellant and TSgt MP on the morning after the alleged assault. The Government and TSgt MP—through counsel—generally opposed the defense motion.

In accordance with Mil. R. Evid. 412(c)(2), the military judge conducted a closed hearing during which he received evidence and heard arguments on the motion. In the course of the hearing the Defense modified the scope of its request. After the hearing the military judge issued a written ruling on the motion. We summarize below aspects of the ruling relevant on appeal.

The military judge rejected the Defense's argument that evidence of sexually explicit texts between Appellant and TSgt MP between October 2014 and February 2015 was admissible under Mil. R. Evid. 412(b)(1)(B) as evidence of

---

[4] The trial transcript, appellate exhibits, and briefs addressing this excluded evidence were sealed pursuant to Rule for Courts-Martial (R.C.M.) 1103A. These portions of the record and briefs remain sealed, and any discussion of sealed material in this opinion is limited to that which is necessary for our analysis. *See* R.C.M. 1103A(b)(4).

specific sexual behavior between an alleged victim and the accused offered by the Defense to prove consent. Although the military judge acknowledged that whether TSgt MP consented on the night in question was a relevant issue, he reasoned that the sexual text messages between October 2014 and February 2015 were unrelated to the August 2015 encounter and too remote in time to be relevant. In short, the military judge ruled the texts were inadmissible as to consent.

The military judge did permit the Defense to cross-examine TSgt MP about the fact that she and Appellant exchanged sexually explicit text messages as constitutionally required evidence under Mil. R. Evid. 412(b)(1)(C), but only for the limited purpose of impeaching TSgt MP's credibility. The military judge reasoned that, to the extent TSgt MP minimized her prior interactions with Appellant in her statements to the AFOSI and potentially to others, the Defense was entitled to use the fact that she had engaged in such sexual exchanges for the limited purpose of challenging her credibility. However, the military judge only permitted questions on cross-examination about the general nature of the text messages and forbade the Defense from introducing the texts themselves or from reading them or having them read on the record. The military judge also permitted the Defense to cross-examine TSgt MP about the fact that she engaged in "mutual masturbation" one time with Appellant for the similar limited purpose of challenging TSgt MP's credibility pursuant to Mil. R. Evid. 412(b)(1)(C).

The military judge permitted evidence of the consensual sexual intercourse on the morning after the alleged assault under Mil. R. Evid. 412(b)(1)(C) as evidence constitutionally required to permit Appellant to present a defense, specifically that there was no sexual assault on the night in question because TSgt MP actually consented.

### b. TSgt MP's Testimony

On direct examination, TSgt MP touched briefly on her relationship with Appellant prior to August 2015, including that she had "sexted or flirted" with Appellant between October 2014 and December 2014. She then testified regarding her memory of the events following Appellant's arrival at her home on 28 August 2015, as described above. On cross-examination, TSgt MP acknowledged that she described Appellant to the AFOSI agents as "somebody [she] hadn't seen in 10 years, a buddy, an acquaintance, someone [she] had innocently flirted with in the past." She further acknowledged on cross-examination that she had "sexted" with Appellant "throughout the fall of 2014" and that one time they "engaged in mutual masturbation over Facetime," although she continued to characterize this as "innocent flirting." TSgt MP also agreed that it was "fair to say" that, if she and Appellant had "met up" in the fall of 2014, the "plan" was they would "have sex."

7

Trial defense counsel then questioned TSgt MP about texts from August 2015 that the Government had introduced as a prosecution exhibit. Specifically, trial defense counsel questioned her about a text from Appellant to the effect that TSgt MP might repay some of a "debt" she owed him when they met in Tampa and TSgt MP's response that the "debt" had already been paid. TSgt MP denied trial defense counsel's suggestion that the reference to "debt" was a reference to sex and testified it was instead simply a reference to betting on sports. Trial defense counsel then requested a closed hearing pursuant to Mil. R. Evid. 412. The Defense argued the military judge should permit cross-examination regarding TSgt MP having previously sent Appellant, in one of the excluded text messages, a sexually charged photo of herself as payment for a "debt." The military judge rejected the Defense's argument and reopened the court. The military judge later clarified on the record that, as to this particular hearing regarding references to a "debt," he had also determined to exclude the evidence under Mil. R. Evid. 403 because "whatever minimal probative value that information had was outweighed by the danger of unfair prejudice, cumulative presentation of evidence as well as waste of time."

### c. Instructions

The military judge provided the court members instructions limiting how they could use evidence of TSgt MP's sexual text messages and mutual masturbation with Appellant:

> Evidence has been introduced indicating that [TSgt MP] has engaged in past acts of sending messages of a sexual nature and engaging in an instance of mutual masturbation with [Appellant]. This evidence should be considered by you as to its impact, if any, on [TSgt MP]'s credibility. That is, to the extent it contradicts other statements that she may have made. *This evidence may not be used to show [TSgt MP] consented to the charged offense, or for any other purpose.*

(Emphasis added).

### 2. Law

"We review a military judge's decision to admit or exclude evidence for an abuse of discretion. 'A military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect.'" *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (citation omitted) (quoting *United States v. Olson*, 74 M.J. 132, 134 (C.A.A.F. 2015)). The application of Mil. R. Evid. 412 to proffered evidence is a legal issue that appellate courts review de novo. *United States v. Roberts*, 69 M.J. 23, 27 (C.A.A.F. 2010) (citation omitted).

Mil. R. Evid. 412 provides that, in any proceeding involving an alleged sexual offense, evidence offered to prove the alleged victim engaged in other sexual behavior or has a sexual predisposition is generally inadmissible, with three limited exceptions, the second and third of which are pertinent to this case. The burden is on the defense to overcome the general rule of exclusion by demonstrating an exception applies. *United States v. Carter*, 47 M.J. 395, 396 (C.A.A.F. 1998) (citation omitted).

The second exception under Mil. R. Evid. 412 includes "evidence of specific instances of sexual behavior by the alleged victim with respect to the person accused of the sexual misconduct offered by the accused to prove consent . . . ." Mil. R. Evid. 412(b)(1)(B). Evidence that fits this exception may nevertheless be excluded if the probative value of the evidence is outweighed by the danger of unfair prejudice to the alleged victim's privacy. Mil. R. Evid. 412(c)(3). In addition, like other evidence, evidence otherwise admissible under Mil. R. Evid. 412(b)(1)(B) may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence." Mil. R. Evid. 403. Where a military judge conducts a proper balancing test under Mil. R. Evid. 403, an appellate court will not overturn the ruling absent a clear abuse of discretion. *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2010) (quoting *United States v. Ruppel*, 49 M.J. 247, 251 (C.A.A.F. 1998)). However, we "give[ ] military judges less deference if they fail to articulate their balancing analysis on the record, and no deference if they fail to conduct the Rule 403 balancing." *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (citation omitted).

The third exception under Mil. R. Evid. 412 provides that the evidence is admissible if its exclusion "would violate the constitutional rights of the accused." Mil. R. Evid. 412(b)(1)(C). Generally, evidence of other sexual behavior by an alleged victim is constitutionally required and "must be admitted within the ambit of [Mil. R. Evid.] 412(b)(1)(C) when [it] is relevant, material, and the probative value of the evidence outweighs the dangers of unfair prejudice." *United States v. Ellerbrock*, 70 M.J. 314, 318 (C.A.A.F. 2011) (citation omitted).

### 3. Analysis

Appellant contends the military judge abused his discretion by excluding the sexual texts and testimony regarding mutual masturbation as evidence of consent pursuant to Mil. R. Evid. 412(b)(1)(B) and, with respect to TSgt MP's credibility, by limiting the Defense to the fact that she exchanged sexually explicit texts with Appellant while excluding the texts themselves pursuant to Mil. R. Evid. 412(b)(1)(C). Appellant argues these exclusions enabled TSgt MP (through her testimony) and trial counsel (through her argument) to mischaracterize the nature of TSgt MP's relationship with Appellant, thereby hobbling

the Defense. We conclude that the military judge did abuse his discretion by failing to admit evidence offered by the Defense to prove consent pursuant to Mil. R. Evid. 412(b)(1)(B).[5]

### a. Mil. R. Evid. 412(b)(1)(B) Exception

In its motion the Defense contended the evidence of sexual texts and mutual masturbation was admissible under Mil. R. Evid. 412(b)(1)(B) because it demonstrated TSgt MP's "sexual familiarity and comfort" with Appellant, "thereby making it more likely [that she] consented to any other sexual behavior with him." In other words, the Defense argued that this evidence made it more likely that sexual intercourse on the night in question was consensual rather than a sexual assault. The military judge conceded that consent was a relevant issue because if TSgt MP actually consented then she necessarily had the capacity to consent, and therefore Appellant could not be guilty on the theory of sexual assault charged by the Government—that TSgt MP was incapable of consenting due to impairment by alcohol. *See* Article 120(b)(3)(A), UCMJ, 10 U.S.C. § 920(b)(3)(A).

However, the military judge essentially concluded the sexual text exchanges and mutual masturbation were too remote in time to be relevant to the events of 28–29 August 2015. He explained in his written ruling:

> These text messages start almost 11 months prior to the alleged offense and end 7 and a half months prior to the alleged offense. Although many are sexual in nature, none discuss [Appellant] and [TSgt] MP planning to meet up in August 2015. The messages to [sic] periodically refer to plans to meet up, however, there is no discussion of meeting up between the end of the messages in this period and 22 August 2015. These text messages do not provide any information as to whether or not [TSgt] MP consented to sexual activity the night of 28 August 2015, nor do they provide any information as to her capability to consent that night. The fact that [Appellant] and [TSgt] MP exchanged sexually explicit texts 7 and a half months earlier is too remote to have any bearing on [TSgt] MP's actual consent or capability to consent the night of 28 August 2015.

We agree with the military judge that evidence meeting an exception under Mil. R. Evid. 412(b) must also be relevant to be admissible. *See* Mil. R.

---

[5] Because we conclude that the error with regard to Mil. R. Evid. 412(b)(1)(B) requires us to set aside Appellant's sexual assault conviction, we do not address whether the military judge erred with respect to the limitations imposed on evidence admitted under Mil. R. Evid. 412(b)(1)(C) as to credibility.

Evid. 402(b) ("Irrelevant evidence is not admissible."); 412(c)(3) (stating evidence meeting a Mil. R. Evid. 412(b) exception may be admissible if, *inter alia*, it is "relevant" for such a purpose). We further agree that the proffered evidence was not relevant to determine the degree of TSgt MP's intoxication on the night of 28 August 2015. However, we find the military judge erred in his conclusion that this evidence had "no bearing" on whether or not TSgt MP actually consented.

Relevance is a "low threshold." *Roberts*, 69 M.J. at 27. Evidence is relevant if it has *any* tendency to make the existence of a fact more probable or less probable than it would be without the evidence. Mil. R. Evid. 401(a). We find the evidence that TSgt MP exchanged sexually charged messages with Appellant for approximately three months, discussed meeting to engage in sexual intercourse with him, and masturbated with him (albeit by remote means) has *some* tendency to make it more probable that the sexual intercourse they engaged in upon her next meeting with him was consensual, as compared to, for example, someone with whom TSgt MP had *never* sexted, masturbated, or discussed meeting for sex. Although the lapse of time may diminish the relevance, it does not eliminate the relevance. This is particularly so where sexual matters were such a prominent feature of their interactions. Of course, we do not find that these activities *by themselves* prove consent to subsequent sexual intercourse. *See* Article 120(g)(8)(A), UCMJ, 10 U.S.C. § 920(g)(8)(A). However, as we have said before, proof of consent is not the test for relevance, and "[i]t is enough that the evidence had a tendency to support the Defense's case." *United States v. Harrington*, No. ACM 39223, 2018 CCA LEXIS 456, at *16 (A.F. Ct. Crim. App. 25 Sep. 2018) (unpub. op.). The Defense's theory of the case was that Appellant and TSgt MP engaged in consensual sexual intercourse on the night of 28–29 August 2015, which came about as a continuation of consensual sexual interactions that dated back to October 2014. Evidence of those interactions was therefore relevant and significant for the Defense's case.

The Government relies on our sister court's opinion in *United States v. Andreozzi*, 60 M.J. 727, 739 (A. Ct. Crim. App. 2004), for the proposition that evidence is "relevant" under Mil. R. Evid. 412(b)(1)(B) when the prior sexual activity and the charged activity are similar and they are "distinctive and unusual." The Government misconstrues *Andreozzi*, which actually states "[r]elevance of prior sexual activity between an accused and an alleged victim *is increased* by the degree of its similarity to the charged conduct, and whether the sexual activity is distinctive and unusual." *Andreozzi*, 60 M.J. at 739. Thus similarity and distinctiveness are not indispensable qualities of relevant Mil. R. Evid. 412(b)(1)(B) evidence but simply enhance the relevance. Indeed, in *Andreozzi* the court specifically disagreed with the military judge's conclusion that the evidence in question was not *relevant* to show consent. *Id.* Ultimately,

the court found that the evidence was excludable not because it had no relevance—it did—but because the violence and coercion involved in the charged acts were highly dissimilar from the prior consensual acts, reducing the relevance and tipping the balancing tests of Mil. R. Evid. 412(c)(3) and Mil. R. Evid. 403 against admission. *Id.* at 739–40.

### b. Mil. R. Evid. 412(c)(3) and Mil. R. Evid. 403 Balancing Tests

This brings us to the next stage of our analysis. Although relevant and otherwise admissible under Mil. R. Evid. 412(b)(1)(B), evidence of an alleged victim's prior sexual behavior may be excluded under Mil. R. Evid. 412(c)(3) if the probative value is outweighed by the danger of unfair prejudice to the alleged victim's privacy or under Mil. R. Evid. 403 if the probative value is substantially outweighed by the danger of countervailing considerations, such as unfair prejudice, confusion of the issues, misleading the members, undue delay, and cumulativeness.

Having erroneously concluded the sexual texts and evidence of mutual masturbation had no relevance as to consent, the military judge did not conduct any analysis balancing Appellant's Mil. R. Evid. 412(b)(1)(B) interest against TSgt MP's privacy interests. Accordingly, we review this question de novo. The military judge did not conduct or refer to any balancing under Mil. R. Evid. 403 in his written ruling on the defense motion or in conjunction with it. As described above, he did later invoke the Mil. R. Evid. 403 balancing test in a very limited fashion with respect to the Defense's effort to explore the reference to "debt" in texts admitted as part of a prosecution exhibit. However, this limited balancing is of scant significance to our present analysis for three reasons. First, it narrowly addressed a passing reference to a "debt" rather than the broad expanse of sexual communications between TSgt MP and Appellant. Second, it did so specifically not in the context of evidence offered to prove consent under Mil. R. Evid. 412(b)(1)(B), but in the context of the military judge's ruling that the Defense could refer generally to sexual texts only to challenge TSgt MP's credibility as a witness under Mil. R. Evid. 412(b)(1)(C), and to do so without using the content of the texts themselves, an aperture the Defense was seeking to expand. Third, any balancing under Mil. R. Evid. 403 as to evidence of consent under Mil. R. Evid. 412(b)(1)(B) would have been severely hampered by the military judge's failure to acknowledge, even for purposes of argument and analysis, that the evidence had any probative value. Accordingly, we do not afford any deference to the military judge's decision to exclude the evidence. *See Manns*, 54 M.J. at 166.

As for Mil. R. Evid. 412(c)(3), we do not find TSgt MP's privacy interests outweigh the probative value of the evidence such that the Defense should have been precluded from any use of the evidence to prove consent. It is clear that such privacy interests would not preclude the Defense from using evidence of

the fact of a "sexting" relationship and mutual masturbation to prove consent at least to the same extent the military judge independently permitted the Defense to use such evidence for the limited purpose of attacking TSgt MP's credibility. Such use would not expose TSgt MP to greater embarrassment or intrusion; it would simply allow the Defense to make additional use of information the Defense was already permitted to bring out.

Moreover, we are not persuaded that any incremental harm to TSgt MP's privacy interests from portions of the actual text messages with Appellant beyond information that was already to be exposed in court would outweigh the probative value of the evidence. The texts included details that were probative of whether TSgt MP and Appellant engaged in consensual sex on the night in question. For example:

- Appellant and TSgt MP repeatedly discussed Appellant traveling to meet TSgt MP in person over the course of their "sexting" relationship. The texts also included allusions to the fact that Appellant deployed overseas from January 2015 until August 2015. These exchanges are more concrete than TSgt MP's acknowledgment on cross-examination that "the plan" was she would have had sex with Appellant had they met in the fall of 2014. Had the court members received this information, and had the Defense been allowed to use it as evidence of consent, the members might have been more receptive to a defense argument that the 28 August 2015 encounter in Tampa was the fulfillment of longstanding plans to meet to engage in sexual activity that were interrupted by Appellant's deployment.

- Appellant and TSgt MP repeatedly referred to the prospect of engaging in sexual intercourse while TSgt MP was menstruating. Appellant expressed his willingness to do so. Although TSgt MP's comments were ambiguous as to whether or not she would be willing, this evidence, coupled with her testimony that she did engage in consensual vaginal intercourse the morning after the alleged assault—after her period started—had the potential to counter TSgt MP's testimony that she was not going to have sex with Appellant on the night of 28–29 August 2015 because her period had started.

- Notwithstanding TSgt MP's testimony that Appellant's August 2015 comment about her repaying a "debt" when they met was simply a reference to sports betting, the texts indicate that Appellant's prior references to "debt" did have sexual connotations. For example, at one point TSgt MP sent Appellant a revealing photo of herself in supposed payment of this "debt."

Accordingly, we conclude Mil. R. Evid. 412(c)(3) would not bar this evidence.

Similarly, we find that countervailing interests such as those articulated in Mil. R. Evid. 403 would not have substantially outweighed the probative value of the evidence. Again, permitting the Defense to make additional use of evidence the military judge was already allowing for purposes of credibility would not have increased the prejudice to TSgt MP's privacy interests. It would not have generated undue delay or been cumulative. As for the risk of confusing or misleading the members, permitting the members to consider this evidence as to consent as well as credibility would likely have simplified rather than complicated the members' deliberations. As it was, the military judge's instructions required them to use the evidence only for the limited purpose of assessing TSgt MP's credibility in light of other statements she might have made, while disregarding it for the common sense and substantive purpose of assessing what the prior sexual interactions between TSgt MP and Appellant indicated regarding the critical issue of consent on the night in question. In other words, allowing use under Mil. R. Evid. 412(b)(1)(B) as well as (C) would have permitted the members to take off the legal blinders to a significant extent and simplified their deliberations.

Furthermore, as described above, we find the details of the texts had significant probative value as to consent under Mil. R. Evid. 412(b)(1)(B) well beyond TSgt MP's acknowledgment of a general "sexting" or "flirting" relationship. Moreover, the texts generally speak for themselves, and admitting them as an additional exhibit would not have unduly confused the members or burdened the court. Accordingly, we find the military judge erred by excluding evidence of text messages and mutual masturbation between TSgt MP and Appellant offered by the Defense to prove consent pursuant to Mil. R. Evid. 412(b)(1)(B).

### c. Prejudice

The test for whether a nonconstitutional error was harmless is "'whether the error itself had substantial influence' on the findings." *United States v. Walker*, 57 M.J. 174, 178 (C.A.A.F. 2002) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). "Whether an error, constitutional or otherwise, was harmless, is a question of law that we review de novo. . . . For nonconstitutional errors, the Government must demonstrate that the error did not have a substantial influence on the findings." *United States v. Hall*, 66 M.J. 53, 54 (C.A.A.F. 2008) (alteration in original) (quoting *United States v. McCollum*, 58 M.J. 323, 342 (C.A.A.F. 2003)) (additional citation omitted). In assessing whether the erroneous exclusion or admission of evidence had "substantial influence" we consider four factors: "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *United States v. Clark*, 62

M.J. 195, 200–01 (C.A.A.F. 2005) (quoting *United States v. Kerr*, 51 M.J. 401, 405 C.A.A.F. 1999)).

As to the first factor, the Government's case that Appellant sexually assaulted TSgt MP had significant weaknesses. As the military judge instructed the members, the Government was required to prove the following elements beyond a reasonable doubt:

> (1) That at or near Tampa, Florida, on or about 29 August 2015, [Appellant] committed a sexual act upon [TSgt MP], to wit: penetrating her vulva with his penis; and
> (2) That [Appellant] did so when [TSgt MP] was incapable of consenting to the sexual act due to impairment by an intoxicant, and that condition was known or reasonably should have been known to [Appellant].

The military judge further instructed the members regarding the capacity to consent:

> A person is "incapable of consenting" when she lacks the cognitive ability to appreciate the sexual conduct in question or the physical or mental ability to make or to communicate a decision about whether she agrees to the conduct.

The Government called only two witnesses regarding this offense, SSgt CW and TSgt MP herself. SSgt CW departed before the alleged assault and did not witness it; TSgt MP had no memory of it. The only documentary evidence the Government introduced was the relatively brief series of texts Appellant and TSgt MP exchanged (fewer than 40) from 22 August 2015 when Appellant informed TSgt MP he was coming to Tampa until his arrival at her residence on 28 August 2015. With no direct witnesses to the assault itself, and no scientific or medical evidence, the Government relied on circumstantial evidence, most notably the evidence that TSgt MP had a tampon inserted when the penetration took place. The Government presented adequate evidence that the alleged sexual act occurred. However, several factors tend to cast doubt as to whether TSgt MP was incapable of consenting or might have in fact consented to the sexual act, including *inter alia*:

- SSgt CW's perception that TSgt MP was merely "tipsy" and not "that drunk," and her observations that TSgt MP was able to speak without slurring, to stand and walk unassisted, and to acknowledge SSgt CW when SSgt CW told TSgt MP she was leaving for the night;
- TSgt MP's last memory of the night, which indicated that at 0200 she was capable of speaking, understanding what Appellant said, standing, taking a step on her own, and reading a clock;

- TSgt MP's willingness not only to engage in consensual sex with Appellant the morning after the alleged assault but to initiate it;
- The series of friendly messages between TSgt MP and Appellant after the night in question that continued until TSgt MP's tampon reappeared.

As to the second factor, the weaknesses in the Government's case strengthened the Defense's case. In addition, the Defense called witnesses of its own. The most significant defense witness regarding the alleged sexual assault against TSgt MP was Dr. MC, who testified as an expert in forensic psychology and sleep medicine.[6] Among other subjects, Dr. MC explained that a memory blackout caused by alcohol consumption is distinct from alcohol-induced impairment of motor skills and executive functions such as judgment, decision-making, and abstract reasoning. In particular, Dr. MC explained that someone experiencing a blackout may still be capable of performing complex tasks, for example, flying an airplane or performing surgery, such that "there really isn't anything that a person can do in a normal waking state or a normal non-blackout state that they can't do when they are blacked out." In other words, according to Dr. MC, TSgt MP's testimony that she could not remember the sexual act creates no inference that she was incapable of consenting when it occurred. At the same time, consuming alcohol affects the inhibitory centers in the brain such that, for example, a drunk person is more likely to engage in sexual practices they would not engage in while sober.

Next we turn to the quality and materiality of the erroneously-excluded evidence of sexual texts and mutual masturbation offered to prove consent under Mil. R. Evid. 412(b)(1)(B). We acknowledge that the significance of the evidence is affected by how close or distant in time the "sexting" and mutual masturbation were to the charged offense and that materiality increases with proximity. Nevertheless, although the "sexting" and mutual masturbation occurred several months before the alleged assault, we find significant materiality. At trial, TSgt MP minimized her sexual interest in Appellant as of August 2015 and insisted she did not intend to have sexual intercourse with him that night. The military judge's exclusion of the evidence as to consent and his instruction that forbade the members from using the evidence for consent or for any purpose other than TSgt MP's credibility hindered the presentation of the defense

---

[6] Regarding the alleged sexual assault against TSgt MP, the Defense also called the physician's assistant and the SANE who saw TSgt MP on 2 September 2015. Both provided some testimony suggesting TSgt MP gave them somewhat incomplete or misleading information regarding the alleged sexual assault and its aftermath. For example, the physician's assistant testified TSgt MP omitted the consensual sex on the morning of 29 August 2015, and the SANE's notes reflected TSgt MP told her Appellant had admitted to having sex with her while she was "unconscious."

theory that TSgt MP actually consented to sexual intercourse that as a continuation of their prior consensual sexual activity, which continued after the alleged assault when TSgt MP initiated consensual sex the following morning.

This was a very close case, with effectively no witness to the alleged assault itself, no scientific or medical evidence presented by the Government, and significant weaknesses in the evidence that TSgt MP had been incapable of consent. We cannot know which factors ensured the balance of the scales tipped in favor of the Prosecution during the members' deliberations. We are not satisfied that the erroneous exclusion of evidence of prior sexual interactions between Appellant and TSgt MP as evidence of consent did not exert in this case a substantial influence on the members' finding of guilty as to the sexual assault. Accordingly, we cannot affirm the finding.

## B. Announcement of Findings

### 1. Additional Background

The court members were provided a worksheet to aid them in their deliberations and announcement of findings. The worksheet provided several options, including the option to record that Appellant was found "Not Guilty" of all charges and specifications, "Guilty" of all charges and specifications, or mixed findings of "Not Guilty" and "Guilty" of the three charges and several specifications. If the members made mixed findings, the worksheet provided the following options specifically with respect to Charge II, which alleged three violations of Article 120, UCMJ, including Specification 3, the alleged sexual assault against TSgt MP:

> Of all the Specifications of Charge II: (GUILTY) (NOT GUILTY);
>
> Of Specification 1 of Charge II: (GUILTY) (NOT GUILTY);
>
> Of Specification 2 of Charge II: (GUILTY) (NOT GUILTY);
>
> Of Specification 3 of Charge II: (GUILTY) (NOT GUILTY);
>
> Of Charge II: (GUILTY) (NOT GUILTY).

The military judge instructed the president of the court that, once he "finished filling in what is applicable, please line out or cross out everything that is not applicable."

The president announced the following findings with respect to Charge II and its specifications:

> Of all Specifications in Charge II: NOT GUILTY;
>
> Of Specification 1 of Charge II: NOT GUILTY;
>
> Of Specification 2 of Charge II: NOT GUILTY;

Of Specification 3 of Charge II: GUILTY;

Of Charge II: GUILTY.

After the military judge excused the members, trial defense counsel asked that the recording of the findings be replayed because he was "not even sure we understood the findings." The military judge had the bailiff retrieve the findings worksheet and then reexamined it. He stated, "[a]s to specifications of Charge II, we'll have to have them come in and re-announce. What they have annotated is of all the specifications of Charge II, 'Not Guilty,' but they've also annotated 'Guilty' with respect to Specification 3 of Charge II. And then of Charge II, 'Guilty.'"

The military judge had the members return to the courtroom and engaged in the following colloquy with the president and senior defense counsel:

> MJ [Military Judge]: Lieutenant Colonel [M], after we looked at the worksheet, we just have one question that we're going to seek clarification from you. I'm going to provide the worksheet back to you. The section I would like you to look at there is a line about -- as to all of the specifications of Charge II. It appears that "Not Guilty" is annotated; however, there is also a "Guilty" finding annotated as to Specification 3 of Charge II. So it might be an either/or proposition. Either all the specifications of Charge II are "Not Guilty" or there is a "Guilty" in Specification 3. And so I'll provide this back to you. Take a look at it and then let me know what the Court's intent is.
>
> . . . .
>
> SDC [Senior Defense Counsel]: Your Honor, perhaps it would be best if they are able to discuss it in the deliberation room?
>
> MJ: We'll see. I think it may be an easy fix but let me know if you prefer to return to the deliberation room.
>
> PRES [ ]: No, Sir. I think we're just confused on how to best relay our thoughts.
>
> MJ: So, in the line where you have all of the specifications of Charge II.
>
> PRES [ ]: Yes, Sir.
>
> MJ: There's either a "Not Guilty" or a "Guilty" you would put -- I see what you're saying. If your intent is to find [Appellant] "Guilty" of one of the specifications, then you would not read that sentence at all. You would mark that entire sentence out.
>
> PRES [ ]: So both of the lines, "Guilty" and "Not Guilty?"

MJ: Correct.

[The president annotated the change on the Findings Work-sheet.]

. . . .

MJ: Thank you. As the form is now annotated, it's -- you concluded that [Appellant] is "Not Guilty" of Specification 1 of Charge II; "Not Guilty" of Specification 2 of Charge II; and "Guilty" of Specification 3 of Charge II. Is that correct?

PRES [ ]: Yes, sir. That's correct.

MJ: And that would be "Guilty" of Charge II -- right?

PRES [ ]: Yes, sir.

MJ: Defense?

SDC: We understand, Your Honor.

The original findings worksheet included as an appellate exhibit in the record of trial reflects that both the "Guilty" and "Not Guilty" options as to "all the Specifications of Charge II" have been crossed out. The following lines on the worksheet reflect findings of "Not Guilty" as to Specifications 1 and 2, with "Guilty" crossed out and findings of "Guilty" as to Specification 3 and as to Charge II, with "Not Guilty" crossed out.

### 2. Law

Whether a verdict is ambiguous is a question of law we review de novo. *United States v. Ross*, 68 M.J. 415, 417 (C.A.A.F. 2010) (citing *United States v. Rodriguez*, 66 M.J. 201, 203 (C.A.A.F. 2008)). "[T]he right to announcement of all findings in open court is a substantial right of the accused. However, though an error which affects a substantial right of an accused is presumptively prejudicial, 'the presumption may yield to *compelling* evidence in the record that no harm actually resulted.'" *United States v. Timmerman*, 28 M.J. 531, 536 (A.F.C.M.R. 1989) (quoting *United States v. Boland*, 42 C.M.R. 275, 278 (C.M.A. 1970)). "In this regard we look to the record as a whole to determine the intent of the trial court with respect to announcement of the findings." *Id.* (citations omitted).

### 3. Analysis

Appellant asserts we must set aside the findings of guilty as to Charge II and Specification 3 thereunder and dismiss the charge and specification because the announced findings purport to both acquit and convict Appellant of them. Appellant correctly notes that the military judge did not have the court president re-announce the findings, and that neither the findings worksheet

itself nor the military judge's oral clarification on the record constitutes announcement of the findings. *See* Rule for Courts-Martial (R.C.M.) 921(d). Nevertheless, we are not persuaded.

Although the better practice would have been for the military judge to have the president re-announce the clarified findings, the fact that he did not do so does not necessarily require the charge and specification be set aside and dismissed. We find the record compellingly demonstrates the members always intended to find Appellant guilty of Charge II and Specification 3 thereunder. *See Timmerman*, 28 M.J. at 536. The facial incongruity of the announced finding was evidently caused by the members' initial understanding that the charge sheet required them to make a finding and mark whether or not Appellant was "Guilty" of "*all* the Specifications of Charge II." (Emphasis added). If they found—and marked—that he was "Not Guilty" of "all" specifications of Charge II, they were then to record findings as to each of the individual specifications and to the charge. Understood this way, the announced findings are not inconsistent because the members did not find Appellant guilty of *all* specifications under Charge II, only of Specification 3 and of the Charge itself, as announced. The military judge's colloquy with the president, the president's additional annotation to the worksheet, and trial defense counsel's acknowledgment of understanding and failure to object make the members' finding and all parties' understanding of it quite clear. Therefore, Appellant suffered no prejudice from the fact that the members did not re-announce the findings.[7]

Appellant's reliance on a line of cases addressing ambiguous findings resulting from the exception of the term "divers" from a specification is inapt. *See United States v. Trew*, 68 M.J. 364, 367 (C.A.A.F. 2010); *United States v. Wilson*, 67 M.J. 423, 428 (C.A.A.F. 2009); *United States v. Augspurger*, 61 M.J. 189, 192 (C.A.A.F. 2005); *United States v. Walters*, 58 M.J. 391, 396 (C.A.A.F. 2003). In those cases, the fatal ambiguity resulted from the apparent finding that the accused was not guilty of one or more instances of misconduct implicit in the exception of the "divers occasions" language, without clarification in the findings as to which instance the court-martial found the accused guilty. Appellant's case presents no such ambiguity and no cause to dismiss Charge II and its Specification 3.

---

[7] In *Timmerman*, the court affirmed findings of guilt despite the failure of the court members to announce *any findings at all* with respect to three specifications under one of the charges because, "based upon the entire record . . . the appellant has suffered no prejudice from the irregular form in which the jury's [sic] verdict was announced." 28 M.J. at 537; *see also United States v. Gates*, No. ACM S32504, 2018 CCA LEXIS 490, at *6 (A.F. Ct. Crim. App. 12 Oct. 2018) (per curiam) (relying on *Timmerman*), *rev. denied*, 2019 CAAF LEXIS 71 (C.A.A.F. 2019).

**C. Post-Trial Delay**

**1. Additional Background**

Appellant's trial concluded on 20 March 2017. The convening authority took action on the findings and sentence 139 days later on 6 August 2017. The record was docketed with this court on 29 August 2017.

On 12 September 2018, this court returned the record to The Judge Advocate General for remand to the convening authority for correction of the record pursuant to R.C.M. 1104(d), specifically to address six appellate exhibits that were missing from the original record of trial. The record was to be returned to the court no later than 12 November 2018. On 15 November 2018, this court granted in part the Government's out-of-time motion for an extension of time until 30 November 2018 to comply with the court's prior order. On 29 November 2018, the Government moved to attach the certificate of correction and the missing appellate exhibits; this court granted the motion on 10 December 2018. Appellant filed his assignments of error on 13 December 2018, the Government filed its answer on 15 January 2019, and Appellant filed his reply to the Government's answer on 22 January 2019.

**2. Law**

In *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006), the CAAF established a presumption of facially unreasonable delay when the convening authority does not take action within 120 days of trial, when a record of trial is not docketed with the service court within 30 days of the convening authority's action, and when this court does not render a decision within 18 months of the case being docketed. Where there is such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review; and (4) prejudice to the appellant. *Moreno*, 63 M.J. at 135 (citations omitted). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

**3. Analysis**

The 139 days that elapsed between the conclusion of Appellant's trial and the convening authority's action exceeded the 120-day standard for a presumptively unreasonable delay the CAAF established in *Moreno*. Therefore, we consider the four *Barker* factors, beginning with the length of the delay itself. In this case, the delay between sentence and action exceeded the *Moreno* standard

by 19 days. This is sufficient to trigger a full due process analysis and weighs in Appellant's favor, but only modestly.

As to the second factor, we find in the record adequate reasons for the delay. This was a lengthy trial, spanning 11 days of in-court proceedings amounting to nearly 1,700 transcript pages, with well over 100 exhibits consisting of many hundreds of pages. As a result, the court reporter did not receive the final authentication from the military judge until 26 June 2017. The staff judge advocate signed her recommendation to the convening authority the same day. Trial defense counsel requested and was granted a 10-day delay until 23 July 2017 to submit clemency matters to the convening authority. The Defense submitted Appellant's clemency request on 22 July 2017. The clemency submission was extensive and robust, consisting of 175 pages and asserting seven different legal errors. Under these circumstances, we find the reasons for the delay weigh substantially in the Government's favor.

As for the third factor, we do not find a specific demand for timely post-trial review before action. On the contrary, trial defense counsel's request for an extension in which to submit clemency matters specifically discounted the Government's concern with meeting the 120-day *Moreno* standard; the Defense asserted the delay would benefit Appellant rather than prejudice him. Accordingly, we find this factor favors the Government.

Finally, with regard to prejudice, in *Moreno* the CAAF identified three types of cognizable prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted). We do not find that Appellant has demonstrated that, as a result of the sentence-to-action delay, he suffered particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision. *See id.* at 140. Nor do we find this delay has impaired his ability to prepare a defense at a rehearing. *See id.* However, given our conclusion that Appellant's conviction for sexual assault and his sentence must be set aside, we do find Appellant suffered at least some marginal degree of prejudice from confinement, given that this sentence might have been set aside sooner without the delay. *See id.* at 140–41. Nevertheless, considering all the factors together we do not find a violation of Appellant's due process right to timely post-trial processing and appeal arising from the delay between sentencing and action.

However, Appellant focuses his post-trial due process claim not on the delay between sentencing and action, but on the delay at our court following the docketing of the record on 29 August 2017. Appellant points to delays in filing his assignments of error occasioned by the mobilization of his appellate defense counsel, by the Government's failure to include several appellate exhibits in

the original record of trial, and by the Government's delay in accomplishing the correction of the record directed by this court. Yet, as the Government notes, the 18-month standard for facially unreasonable delay between docketing at this court and issuance of a decision has not been exceeded. *See id.* at 142. Although we acknowledge the CAAF in *Moreno* "did not purport to set forth the *exclusive* criteria for facially unreasonable delay," *United States v. Swanson*, No. ACM 38827, 2016 CCA LEXIS 648, at *21 (A.F. Ct. Crim. App. 27 Oct. 2016), under the circumstances in this case—particularly the size of the record, complexity of the issues, absence of a government request for an extension of time to file an answer brief, and relatively swift issuance of this opinion within 45 days of the filing of the Government's answer—we do not find the post-docketing delay violated Appellant's due process right to timely appellate review.

Finally, recognizing our authority under Article 66, UCMJ, we have also considered whether relief for excessive post-trial delay at any point is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude it is not.

### III. CONCLUSION

The finding of guilty as to Charge II, the finding of guilty as to Specification 3 of Charge II, and the sentence are **SET ASIDE**. A rehearing is authorized. The case is returned to The Judge Advocate General for further processing consistent with this opinion.

LEWIS, Judge (concurring in the result):

I concur with my esteemed colleagues that the military judge abused his discretion by failing to admit evidence under Mil. R. Evid. 412(b)(1)(B) on the issue of consent. I write separately as I would find less evidence admissible under Mil. R. Evid. 412(b)(1)(B)'s exception and would also rely on Mil. R. Evid. 412(b)(1)(C)'s exception to admit evidence required by the Constitution as grounds for admissibility of some of the actual text messages.

The majority generally found that the evidence that TSgt MP exchanged sexually charged messages with Appellant for approximately three months, discussed engaging in sexual intercourse with him, and masturbated with him (albeit by remote means) had *some* tendency to make it more probable that the two carried out their plan to engage in consensual sexual intercourse. Next,

the majority found, under Mil. R. Evid. 412(c)(3), that TSgt MP's privacy interests did not outweigh the probative value of this evidence. Finally, the majority found the countervailing interests articulated in Mil. R. Evid. 403 would not have substantially outweighed the probative value of the evidence. The majority did not rely on Mil. R. Evid. 412(b)(1)(C)'s constitutionally required exception.

Addressing only Mil. R. Evid. 412(b)(1)(B) at this point, I find the vast majority of the sexually charged text messages between Appellant and TSgt MP have marginal probative value, at best, on the issue of consent. The messages had high probative value for what may have been planned if Appellant visited TSgt MP in the fall or winter of 2014 at her prior duty station. By the time 28 August 2015 arrived, these messages had much lower probative value on the issue of consent, especially considering the five-month gap in time from 11 March 2015 to 22 August 2015 when no text messages were exchanged between Appellant and TSgt MP, perhaps due to Appellant's deployment. Appellant's first text message to TSgt MP on 22 August 2015 read, "What's been up stranger? Remember me?" Even if the majority is correct that the military judge abused his discretion on his relevance determination under Mil. R. Evid. 401 and 402, I would find the vast majority of the sexually charged text messages to be properly excluded under the balancing tests of Mil. R. Evid. 412(c)(3) and 403.

Similarly, I find the evidence that Appellant and TSgt MP mutually masturbated via FaceTime on one occasion at least eight to ten months prior to meeting in person to have marginal probative value on the issue of consent. Under Mil. R. Evid. 412(b)(1)(B)'s exception and assuming *arguendo* that the marginal probative value would not be outweighed by TSgt MP's privacy interests, I would exclude this evidence under Mil. R. Evid. 403. Even giving no deference to the military judge's ruling—as he did not articulate his balancing test—I would find the evidence properly excluded as its marginal probative value would be substantially outweighed by the potential for confusing the issues and misleading the members, particularly on the issues of consent and the capacity to consent.

I find one specific subject in the text messages, discussed in detail below, to have a higher probative value on the issue of consent even after the passage of time described above. To me, the probative value of this subject is less impacted by the passage of time given the overlap and intersection with the findings testimony by TSgt MP about the night of 28 August 2015 and morning of 29 August 2015. Under Mil R. Evid. 412(b)(1)(B), I would find this one subject required admission on the issue of consent even after conducting the balancing tests under Mil. R. Evid. 412(c)(3) and 403. I would find the military judge's

ruling excluding the actual text messages in this area materially prejudiced Appellant.

The specific subject involves text messages where Appellant and TSgt MP discussed sexual intercourse during a woman's menstrual cycle. During opening statement, the Prosecution noted that TSgt MP will "tell you how she felt relieved [by the start of her period] because it was an easy way to let the accused down and she'll tell you that it was a great excuse not to have sex because she did not want to have sex." TSgt MP's testimony made clear that she was "relieved" to begin her menstrual cycle because it meant she "was not going to have sex with [her] period just starting."

The text messages that were not admitted would have provided the members a reliable source of information showing that TSgt MP and Appellant had three separate exchanges about this specific topic during October and November 2014. One reasonable interpretation of these text messages is that TSgt MP would be open to consenting to sexual intercourse with Appellant during her period. While that was not the only interpretation possible, the military judge's ruling precluded the Defense from presenting evidence on this interpretation.

The military judge certainly admitted evidence that TSgt MP actually consented to sexual intercourse with Appellant the next morning while knowing she was menstruating. However, TSgt MP testified she consented to sexual intercourse the next morning for a specific reason: "to get my power back." The text messages from October and November 2014 would have provided important context to the members for the timeframe before TSgt MP believed Appellant had sexual intercourse with her without her consent. I would find them admissible under Mil. R. Evid. 412(b)(1)(B)'s exception on the issue of consent and the military judge's conclusion to the contrary to be incorrect.

To be clear, the military judge's written ruling specifically found that the text messages did not express a "general willingness" by TSgt MP to engage in sex while "on one's period" and concluded that this evidence "says nothing at all about consent on a particular occasion." However, the military judge's ruling also left the Defense no opportunity to challenge TSgt MP's testimony that she was relieved because she was not going to have sex once her period started. This powerful testimony could have certainly impacted the findings in this case and led a reasonable member to conclude the evidence showed that TSgt MP would never have consented to sexual intercourse with Appellant during her period, except under the highly unusual circumstances of their sexual intercourse the next morning. Additionally, the text messages themselves arguably painted a different picture of TSgt MP's credibility and their exclusion denied the Defense an opportunity for effective cross-examination in this area. *See*

*Delaware v. Van Arsdall*, 475 U.S. 673, 679–680 (1986); *United States v. Gaddis*,70 M.J. 248, 256 (C.A.A.F. 2011). I would further find inquiry into these text messages admissible under the constitutionally required exception of Mil. R. Evid. 412(b)(1)(C) as relevant, material, and vital to the Defense and the exclusion of this inquiry to be beyond the scope of a trial judge's wide latitude to impose reasonable limits on cross-examination. *See id.*

The majority also would find text messages referencing TSgt MP paying Appellant a "debt" admissible to show that the term "debt" was actually a reference to sex. I agree with the majority's ultimate conclusion but would do so only under Mil. R. Evid. 412(b)(1)(C). On the whole, TSgt MP's testimony during cross-examination that the use of the word "debt" was not a reference to sex "because that sounds like prostitution" had the potential to mislead the members because the content of the text messages made clear Appellant and TSgt MP used the term as a sexual reference. As a result, I would find some of the messages to be relevant, material, and vital to the Defense after TSgt MP essentially opened the door to their admissibility with her testimony denying "debt" was a sexual reference. We have noted before that "trials are fluid" and "evidence that may not be constitutionally required at the outset of the trial because it fails the balancing test may become constitutionally required as other evidence in introduced." *United States v. Sousa*, 72 M.J. 643, 650 (A.F. Ct. Crim. App. 2013). In this case, I believe a reasonable panel would have received a significantly different impression of TSgt MP's credibility if the Defense was permitted to pursue this additional line of cross-examination with the content of some of the text messages involving the "debt" reference. *See id.*

On the remaining issues, I concur with the majority's resolution of the purported ambiguity with the announcement of findings and the assessment of post-trial delay.


FOR THE COURT

CAROL K. JOYCE
Clerk of the Court